JUDGE FORREST

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK         14 CV  7152
------------------------------------x
SAMANTHA LAMBUI,                          Index No.:

                    Plaintiff,
                                          Date Purchased:
       -against-

JAMES C. COLLINS, ROBERT LIMMER,          COMPLAINT AND
ROSEMARIE DAVITT, KEELEY WEIR,            JURY DEMAND
UBS FINANCIAL SERVICES, INC.,

                    Defendants.
------------------------------------x

RECEIVED SEP 05 2014 U.S.D.C. S.D.N.Y. CASHIERS

       Plaintiff, SAMANTHA LAMBUI, by and through her counsel of record, Jon-Paul Gabriele, Esq., of the law offices of Gabriele & Marano, LLP, and for causes of actions against the Defendants, and each of them, alleges:

## NATURE OF CASE

       1.   This is an action for monetary damages and other redress brought by the Plaintiff against the Defendants for unlawful employment discrimination, unlawful sexual harassment, unlawful retaliation, sexual battery, civil battery, civil assault, wrongful imprisonment, negligent hiring, wrongful termination, and illegal employment practices in violation of United States law, namely Title VII of the Civil Rights Act of 1964, § 1981 (hereinafter, "§ 1981"); New York State Law, namely New York State Human Rights Law §§ 290 *et seq* (hereinafter, "NYSHRL"); and/or New York City law, namely Title 8 of the Administrative Code of the City of New York, also known as New

York City Human Rights Law, (hereinafter, "NYCHRL"), and for any other cause(s) of action that can be inferred from the facts set forth herein.

## JURISDICTION – Federal Question

2. The Court has Federal Question Jurisdiction pursuant Defendants' violation of Federal Law and their deprivation of Plaintiff's civil rights under Title VII of the Civil Rights Act of 1964, Section 1981.

3. As such, this Honorable Court has Federal Question jurisdiction pursuant to the provisions of 42 U.S.C. § 1331.

## JURISDICTION – Supplemental

4. Although claims arising under New York State law and New York City law are interposed herein, this Honorable Court has jurisdiction over these claims pursuant to 42 U.S.C. § 1367. The claims asserted pursuant to state law arise out of the same nucleus of operative facts as those asserted pursuant to federal law, and it is respectfully submitted that it is logical that all claims are argued under the same case.

## PARTIES

5. Plaintiff, SAMANTHA LAMBUI is a female citizen of Suffolk County, New York, born December 1, 1989. Plaintiff was employed by Defendant UBS FINANCIAL SERVICES, INC., working under Defendant, JAMES C. COLLINS, her supervisor. At all times

2

relevant herein, Plaintiff was an "employee" within the meaning of the NYCHRL, § 1981, and the NYSHRL.

6. Defendant, UBS AG, is the parent company of UBS FINANCIAL SERVICES, INC. (hereinafter, "UBSFS") is a Delaware corporation with its principal place of business in New Jersey but with business offices throughout New York State, including in New York County and Suffolk County. Defendant UBS FINANCIAL SERVICES, INC. employed all other Defendants named herein at all applicable times mentioned herein. At all relevant times herein, Defendants UBS AG and UBSFS employed 500 or more employees and are each an "employer" and/or a "person" within the meaning of the NYCHRL, § 1981, and the NYSHRL.

7. Defendant, JAMES C. COLLINS, is a citizen of Suffolk County, New York. JAMES C. COLLINS was at all times relevant to this matter the Vice President of Wealth Management at Defendant UBS FINANCIAL SERVICES, INC. At all relevant times herein, JAMES C. COLLINS was a "person" and an "agent" of UBSFS within the meaning of the NYCHRL, § 1981, and the NYSHRL. JAMES C. COLLINS was at all times relevant to this matter Plaintiff's supervisor and/or manager.

8. Defendant, ROBERT LIMMER, is a citizen of Suffolk County, New York. Defendant, ROBERT LIMMER, is the Branch Manager of the UBS FINANCIAL SERVICES, INC. office located in Melville, New York. At all relevant times herein, ROBERT LIMMER

3

was a "person" and an "agent" of UBSFS within the meaning of the NYCHRL, § 1981, and the NYSHRL.

9. Defendant, ROSEMARIE DAVITT, is a citizen of Nassau County, New York. Defendant, ROSEMARIE DAVITT, is the Assistant Branch Manager of the UBS FINANCIAL SERVICES, INC. office located in Melville, New York. At all relevant times herein, ROSEMARIE DAVITT was a "person" and an "agent" of UBSFS within the meaning of the NYCHRL, § 1981, and the NYSHRL.

10. Defendant, KEELEY WEIR, is a citizen of New York County, New York. Defendant, KEELEY WEIR, is the Director of Human Resources, working out of the UBS FINANCIAL SERVICES, INC. offices located in Manhattan, New York. At all relevant times herein, KEELEY WEIR was a "person" and an "agent" of UBSFS within the meaning of the NYCHRL, § 1981, and the NYSHRL.

## VENUE

11. Pursuant to 42 U.S.C. § 1391(b), venue is proper in this district as one of the Defendants, KEELEY WEIR, resides in this district.

12. Pursuant to 42 U.S.C. § 1391(c), a substantial part of the claim arose in this district.

13. Pursuant to 42 U.S.C. § 1391(d), Defendants UBS AG and UBS FINANCIAL SERVICES, INC. have sufficient contacts such that if the Southern District of New York were a separate state, Defendants UBS AG's and UBS FINANCIAL SERVICES, INC.'s contacts

4

would be sufficient to subject it to personal jurisdiction therein.

## PROCEDURAL REQUIREMENTS

14. Plaintiff has complied with all statutory prerequisites to filing this action.

15. On or about October 25, 2013, Ms. Lambui filed a Verified Complaint (Case No.: 10165334) with the New York State Division of Human Rights, Office of Sexual Harassment Issues ("NYSDHR"), charging Defendants with unlawful discriminatory employment practices on the basis of age, sex, opposed discrimination, and retaliation, in violation of the New York State Human Rights Law (N.Y. Executive Law, Article 15), § 296; and Title VII of the Civil Rights Act of 1964.

16. On November 1, 2013, the Equal Employment Opportunity Commission ("EEOC") notified Ms. Lambui of their receipt of Ms. Lambui's Verified Complaint filed with the NYSDHR. The EEOC assigned the matter Charge No.: 16GB400447.

17. On April 24, 2014, the NYSDHR rendered a determination finding probable cause to believe that the Respondents have engaged in or are engaging in the unlawful discriminatory practice complained of. (See, **Exhibit "Q"**).

18. On May 28, 2014, the Honorable Migdalia Pares, Administrative Law Judge of the New York State Division of Human Rights, Ordered that the case be dismissed for administrative

convenience so Ms. Lambui may pursue her claims in United States District Court.

19. On June 18, 2014, the EEOC issued a Dismissal and Notice of Rights indicating their file closed on Ms. Lambui's charge for the following reason: "Charging Party wishes to pursue matter in Federal District Court." This "Notice of Right to Sue" was received by Ms. Lambui on June 20, 2014. (**EXHIBIT "A"**).

20. This action has been filed within 90 days of Plaintiff's receipt of her "Notice of Right to Sue" letter from the EEOC.

21. Prior to the commencement of this action, a copy of this Complaint was served on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of § 8-502 of the New York City Administrative Code.

## STATEMENT OF FACTS

22. In the Fall of 2012, Plaintiff, SAMANTHA LAMBUI (hereinafter, "Ms. Lambui"), was employed as a bartender at Katie Mc's Bar in Huntington, NY. She was working there to save money to pay for her last year of college.

23. Defendant, JAMES C. COLLINS (hereinafter, "Mr. Collins"), first met Ms. Lambui when he came in to the bar as a patron. Mr. Collins frequently requested of Ms. Lambui her shift

times and very frequently patronized Katie Mc's at these times. Over the course of approximately four months, Mr. Collins and Ms. Lambui often spoke at the bar. Their conversation developed from bartender-patron to friendly, but never romantic. Mr. Collins inquired about Ms. Lambui's personal history, parents' marital issues, and difficulties that existed in her relationships with her family and friends. Mr. Collins and Ms. Lambui developed a friendly relationship that was neither sexual nor physical. Mr. Collins also frequently requested to see Ms. Lambui's photos on her social media accounts. Mr. Collins even gave Ms. Lambui his cell phone number in order to send her text messages in order to find out when she was working. (**Attached hereto as EXHIBIT "B" is a screen shot from Ms. Lambui's cell phone demonstrating Mr. Collins' cell phone number stored in her cell phone**).

24. In approximately November 2012, Mr. Collins informed Ms. Lambui that he was the Vice President of Wealth Management at Defendant, UBS FINANCIAL SERVICES, INC. (hereinafter, "UBSFS") at their Melville, NY office. Mr. Collins told Ms. Lambui that he watches her, that "she could get anyone to do anything she wanted," and that "she should be doing sales for UBS." Mr. Collins repeatedly told Ms. Lambui that she could start off as his assistant, and, once she graduated college, she would "be sure to have" a job in sales at UBSFS. Mr. Collins

told Ms. Lambui "the faster you graduate from college, the better." Mr. Collins offered to review Ms. Lambui's resume and assist with her application to work for UBSFS.

25. After Mr. Collins' repeated insistence over the course of several weeks that Ms. Lambui possessed a skill set perfect for a position at UBSFS, Ms. Lambui applied for a position. As such, Ms. Lambui re-enrolled in college in order to satisfy UBSFS's requirements to obtain a paid internship. Ms. Lambui changed her major from Psychology to Business for the life-changing opportunity with which Mr. Collins presented her.

26. On approximately December 2, 2012, Ms. Lambui met Mr. Collins at his office for a formal interview. On December 6, 2012, Ms. Lambui thanked Mr. Collins via email, acknowledging that Mr. Collins would be her boss. Mr. Collins did not deny that relationship, but rather confirmed it through words and actions through Ms. Lambui's employment (See, **EXHIBIT "C"**).

27. Mr. Collins frequently and actively led Ms. Lambui to believe that his position at UBSFS afforded him a lifestyle of financial privilege. Mr. Collins would often ask her to arrange gifts for clients, send her images of expensive clothing, and treat her to expensive meals. Ms. Lambui, having limited prior experience in corporate employment, came to believe that this was normal behavior, and was surprised when Mr. Collins' sexual and romantic advances begun.

28. On January 4, 2013, Mr. Collins invited Ms. Lambui via limousine to lunch in New York City to "celebrate [her] acceptance of his offer of employment". Ms. Lambui declined, as she (a 23-year-old woman) did not feel comfortable taking a limousine alone with Mr. Collins (a middle-aged married man.) Mr. Collins insisted, indicating that "I do this for all of my interns" as "an introduction" to the "lavish lifestyle one can expect when working for UBS." On Mr. Collins' assurances that this was part of normal corporate life at UBSFS, she accepted the offer to have lunch together.

29. Following lunch, Mr. Collins attempted to kiss Ms. Lambui. Mr. Collins additionally touched Ms. Lambui in a sexual manner, pushing her hair behind her ears and giving it a slight pull. Ms. Lambui sternly rejected Mr. Collins' advance and was deeply upset by it.

30. Ms. Lambui, worried about her internship at UBSFS, asked via text message whether her rejection of Mr. Collins' advance negatively affected her future at UBSFS. (See, EXHIBIT "D"). Mr. Collins responded via text at 9:30AM on January 5, 2013 "Sorry got tied up at a b-day party. Sure, we're all good. Sometimes i'm a little too sensitive. Hence my text. I thought were hving a great time in nyc and got caught up in the moment. I thought we were on the same page and u were into me a little but i read it wrong. No worries, onward and upward. Enjoy ur ski

trip." At 1:22PM on January 5, 2013 Mr. Collins sent another text message, "Still friends?".

31. At 3:44PM, Ms. Lambui responded via text, "Hey sorry I was snowboarding..of course." Mr. Collins, unable to control himself and still trying to establish a sexual relationship despite Ms. Lambui's refusal, texted "Any thoughts on the first text? Am i too messed up?"

32. Ms. Lambui then sent a text message "I don't want to ruin any thing professionally… So all is fine… If me interning for you is a problem which I hope it's not let me know." At 4:01PM on January 5, 2013, Mr. Collins sent a sarcastic text in response "Ok, it's a problem". Ms. Lambui texted back "is or is not?". Mr. Collins responded "Jk…", "Haha", ":)". Ms. Lambui responded "Yeah yeah yeah." Mr. Collins responded "Hey im a sensitive good looking guy who wears his heart on his sleeve…" Ms. Lambui responded "You lust which isn't a problem of the heart", ";$". Mr. Collins responded sarcastically and sadistically, "That's why ur still working for me fool. I can easily find another bimbo with short hair that looks great in platform shoes…" In light of her desire to obtain the position at UBSFS, Ms. Lambui was forced to ignore the sexist, degrading, insulting comments in the texts and simply respond "perfect I was upset when I thought it wasn't going to work". Mr. Collins responded "What ever, upset? You? Shit rolls off u." At 4:18PM

on January 5, 2013, Ms. Lambui responded "well I was really proud of interning for you and I was upset to think I had lost it", because Ms. Lambui was excited for the opportunity but already worried that tolerating Mr. Collins' harassment was going to be a requirement.

33. At 4:36PM on January 5, 2013, Mr. Collins, again ignoring Ms. Lambui's wishes and trying to establish a sexual relationship, then responded "Really?", "Just curious…did u feel anything/attaction towards me on the nyc trip?". Ms. Lambui ignored his text message as a means by which to convey lack of interest without jeopardizing her chance at obtaining the internship with UBSFS.

34. At 5:24PM on January 5, 2014, Mr. Collins again ignored Ms. Lambui's wishes and texted "Ive been at the nyc boat show drinkin all day so no need to follow up on the last text, humor me. All i knw is that at the speakeasy bar u loved it when i pushed ur hair behind ur ear and grabbed the back of it and gave it a slight pull :) I'll get a second chance…watch". Ms. Lambui was disgusted and horrified by Mr. Collins actions and the subsequent text message by him in which he indicated that he believed she enjoyed his actions. Again, Ms. Lambui ignored Mr. Collins for almost two full days before Mr. Collins sent her another text message on January 7, 2013 at 3:15PM. Ms. Lambui

11

subsequently suffered emotional distress as result. The above text message exchange is annexed hereto as **(EXHIBIT "D")**.

35. In a January 8, 2013 email **(EXHIBIT "E")**, Mr. Collins established Ms. Lambui's work schedule, her responsibilities in working for him, and assigned Ms. Lambui tasks. Mr. Collins documented in this email that fashion items (shoes, purses, etc.) would be available as bonus incentives for superior work, "Tuesday's and Friday's are going to be our (and by our our I mean you) day to prospect and most important days. That's the only way to get the LBs'!!!!!". "LBs" is a reference to Christian Louboutin designer shoes. Ms. Lambui believed this to be a normal part of corporate life at UBSFS. Mr. Collins signed the email "Mr. Boss Man."

36. That same day, January 8, 2013, Ms. Lambui wrote an email in response to Mr. Collins in professional/business format, taking into consideration and responding to every aspect of Mr. Collins' email, except Mr. Collins' reference to LB's. **(EXHIBIT "F")**. Mr. Collins then responded to Ms. Lambui, acknowledging that her "classes come first." Mr. Collins further indicated "Your job is to graduate, this job is yours so take comfort in that and I'm more focused on quality of hours not quantity. Sound good?" (See, **EXHIBIT "G"**).

37. On February 18, 2013, Ms. Lambui thanked Mr. Collins in a professionally-worded email for the opportunity to work at

UBSFS, promised hard work and effort, and asked Mr. Collins to comment on whether her work/class schedule was satisfactory for his needs. (**EXHIBIT "H"**).

38. On February 23, 2013, Mr. Collins forwarded to Ms. Lambui another email regarding Christian Louboutin incentives (**EXHIBIT "I"**).

39. On February 25, 2013, Ms. Lambui showed for her first day of work at UBSFS. She was earning $10 per hour and working approximately twenty hours per week. She received paychecks every two weeks, all of which were paid in UBSFS's name, but subject to the provisions of the UBSFS "Broker-Paid Position," whereby Ms. Lambui's salary was funded by Mr. Collins' salary, and Mr. Collins had a right to approve all of Ms. Lambui's paychecks. Ms. Lambui's duties included: researching venues for client events, researching initial public offerings, emailing clients with updates on stock prices, stock research, sending newsletters regarding news in the financial markets, and more. Mr. Collins indicated to Ms. Lambui that these tasks were good starting points for her ultimate position in sales.

40. On February 27, 2013, Mr. Collins emailed all of his clients informing them of Ms. Lambui's hire. The email touted Ms. Lambui's strengths, indicated that the recipients of the email could "expect emails from her" "going forward" and that

she would be "organizing quarterly client functions." (**EXHIBIT "J"**).

41. On March 5, 2013, Mr. Collins again forwarded Ms. Lambui an email regarding Christian Louboutin bonus incentives. (**Exhibit "K"**).

42. In approximately mid-March of 2013, Mr. Collins specifically assigned Ms. Lambui to go to New York City to interview venues for an upcoming client event. He also told her to purchase new clothing for the purposes of these interviews, at UBSFS' expense. Mr. Collins requested that Ms. Lambui photograph herself in the outfits so he could issue final approval. Mr. Collins specifically gave Ms. Lambui that assignment on that day, because that night, Mr. Collins was going to a basketball game at Madison Square Garden in Manhattan.

43. On this night in March 2013, Mr. Collins told Ms. Lambui that if she met him at a hotel and had sex with him, he would give her the bonus Christian Louboutin shoes the next day. Ms. Lambui replied that she would "absolutely not" meet him, that "no bonus could be worth that" and that she was going to her college class. Ms. Lambui complained to Mr. Collins that his request made her uncomfortable, and again requested that their relationship remain strictly professional. Ms. Lambui subsequently suffered emotional distress as result.

14

44. On March 19, 2013 at 5:30PM, Mr. Collins sent a text message assuring Ms. Lambui that, in his professional and experienced opinion as Vice President of Wealth Management for UBSFS, she was going to be very successful in the corporate world. He texted "I think you will be very successful in this corporate world I Advise you not to commit to anything remember this blue-and-white don't mix". Ms. Lambui replied, jokingly, "Good maybe one day I can afford my shopping habit ;)". Ms. Lambui then tried to understand the second half of Mr. Collins' text, and asked "What do u mean by that?". Mr. Collins responded "You'll figure that out". Ms. Lambui then texted "Blue collar?", as she realized that Mr. Collins' text was a statement that Ms. Lambui was "now" "white collar" since she was working at UBSFS, and that her boyfriend was still blue collar because he worked at Verizon. (**EXHIBIT "L"**). This was one of many examples of Mr. Collins' attempts to destroy Ms. Lambui's relationship with her then boyfriend, and an effort to convince Ms. Lambui to have sex with Mr. Collins. Ms. Lambui often complained to Mr. Collins to cease such comments, as it was negatively affecting her relationship with her boyfriend. Ultimately, Ms. Lambui's boyfriend broke up with her over Mr. Collins' inappropriate communications.

45. On April 4, 2013, Mr. Collins invited Ms. Lambui via text message to his house to get drunk and have sex while his

wife and children were in New York City. He sent a text message indicating that he "had a bottle of wine with" Ms. Lambui's "name on it" and "a bottle of vodka with" Mr. Collins' "name on it". Ms. Lambui was disgusted and insulted by this request, and again ignored the text message for fear of responding the wrong way and fear that she might negatively affect her position at UBSFS.

    46. On April 5, 2013 at 1:02PM, Ms. Lambui sent a text message (See, **Exhibit "M"**) to Mr. Collins "Listen do u know how crazy that sounds? Iv clearly let this go to far.. I want to be ur intern but u can't say things like that to me". Mr. Collins responded sarcastically and sadistically, "Really?". Ms. Lambui responded "it's unflattering on u", "Ur undermining my intelligence and it not fair". Mr. Collins continued his sadistic and sarcastic behavior in text messaging back "R u messing with me or ur serious". Ms. Lambui responded "serious", "I don't want to think of you as creepy and I think I gave you the wrong impression". Mr. Collins had manipulated Ms. Lambui into believing that she was required to tolerate his harassment and his discrimination, and continued same by responding "I guess u did. Thx", "U suck". Still afraid of losing her job, Ms. Lambui sent another text message "U gotta stop.. if u really think I deserve this internship I want it but now ur starting to make— [remainder of text message conversation unavailable].

16

47. On April 5, 2013, at 1:44PM, Mr. Collins insincerely texted "Feel like a jerk now. Fuck me". At 2:03PM, he texted "I guess I have to set the bar lower. No more 6's maybe 4's :)", in attempt to get back on curry Ms. Lambui's favor by insulting her in a sexist manner, referring to her as a "6", meaning a "6 out of 10". At 2:29PM, Mr. Collins texted Ms. Lambui "I guess I shot myself in the foot for happy hour too", again trying to curry favor with Ms. Lambui by trying to convince her to invite him to happy hour.

48. After seven hours of Ms. Lambui ignoring Mr. Collins' text messages, Mr. Collins texted at 8:32PM "I get it coming over may not been such a bright idea, thats my bad i liked spending time with u. i hv to go to south beach fl next week for business. I was going to see if u wanted to go. Maybe i should hv lead with that first. Some day I'll learn :(". Despite Ms. Lambui's prior requests, Mr. Collins again ignored them and tried to convince her to go to Florida with him alone, clearly as an attempt to have sexual relations with her. A copy of the above text message exchange has been annexed hereto as **Exhibit "M"**).

49. Thereafter, Ms. Lambui scheduled a face-to-face meeting with Mr. Collins. She informed him yet again that his behavior was extremely inappropriate, made her feel uncomfortable, and that he cannot speak to her in the manner in

17

which he did. Ms. Lambui indicated to Mr. Collins that she was afraid to lose her job but wanted Mr. Collins to treat her appropriately. Mr. Collins indicated to Ms. Lambui that he understood her complaints, that he would start a Human Resources file on this matter in accordance with UBSFS policy, and that he would promise not to speak to her in that manner going forward. Ms. Lambui understood and intended this to be an escalation of her prior complaints, and consistent with UBSFS Human Resources policies regarding complaints of harassment and discrimination.

50. In May 2013, Mr. Collins informed Ms. Lambui he wanted to give her a bonus for her superior performance at work. Mr. Collins offered during work hours to drive with Ms. Lambui to purchase a Michael Kors designer bag as the bonus for Ms. Lambui's performance. Mr. Collins insisted that Ms. Lambui drive with him in his car, and promised that the purpose of the trip was to compliment Ms. Lambui's superior performance. After initial reluctance and Mr. Collins' assurances and promises that she had no reason to worry, they drove together to purchase the bonus.

51. Immediately after purchasing the bonus and upon re-entry into Mr. Collins' vehicle, Mr. Collins demanded a sexual favor in return for purchase of the bag. Ms. Lambui said "absolutely not," and that she only accepted the bag as a work bonus. Ms. Lambui demanded to be taken back to the office. Mr.

Collins refused, "because people will see us drive back together." Ms. Lambui again insisted that the two drive back to the office.

52. While driving back to the office, Mr. Collins ignored Ms. Lambui's repeated demands to be taken back to the office, and drove into a park near the office. He said "we are just going to wait here until we can go back to the office." Again, Ms. Lambui demanded that he take her back to the office immediately. Mr. Collins refused. Despite Ms. Lambui's repeated plea to leave, Mr. Collins then placed his hand upon her leg, moved it towards her vagina, forced himself upon her and kissed her. Ms. Lambui screamed, cried, curled up in the fetal position, while begging for Mr. Collins to take her back to the office.

53. As a result of this incident, Ms. Lambui missed scheduled work due to emotional distress. Mr. Collins was rude, derogatory, accused Ms. Lambui of doing drugs, and insulted her using personal family issues, including issues with Ms. Lambui's parents' relationship. Ultimately, Mr. Collins sent a text message of apology: "I'm doing some work here going through the days events etc and gave some thought about the things you said today. I felt bad enough about the medication crack but then i Realized I questioned ur level of productivity too. I know U r honestly giving a 100% and are trying ur hardest and putting

extra effort in. On ur own time today u googled information on the mutual funds I purchased today. Although I didn't say it that show me u really like this job and your eager to learn more. I guess sometimes I don't realize my comments can be hurtful and discouraging. I think ur doing a great job, and I like working with you so Please forgive me . Look forward to seeing u tomorrow. Jc". (**EXHIBIT "N"**) In an effort to maintain her position at UBS, Ms. Lambui again tried to move on and continue to work at UBS.

54. On one day in June 2013, Ms. Lambui appeared for work shortly after obtaining a tattoo on her ribs. As it was June, Ms. Lambui was wearing a short-sleeved blouse, allowing the bandage covering the tattoo to be minimally visible through the sleeve hole. Mr. Collins repeatedly asked Ms. Lambui what the bandage was for. Finally, Ms. Lambui revealed that it was covering a new tattoo. Mr. Collins subsequently requested repeatedly, in front of Ms. Lambui's co-workers, that Ms. Lambui lift her shirt and show him the tattoo. Ms. Lambui was insulted, embarrassed, and disgusted by Mr. Collins' demands.

55. On June 14, 2013, Mr. Collins sent Ms. Lambui an email again offering fashion items as incentives. (**EXHIBIT "O"**).

56. On or about June 17, 2013, Scott Scognamilo of UBSFS informed Ms. Lambui via email that her internship was ending on an upcoming date. Ms. Lambui immediately spoke to Mr. Collins